[Civ. No. 6763.   Fourth Dist.   Oct. 11, 1962.]

D. CLAY BROADBENT et al., Plaintiffs and Respondents, v. MODERN IMPERIAL CATTLE COMPANY, Defendant and Appellant.

Joseph Henry Wolf and Paul Wyler for Defendant and Appellant.

Horton, Knox & Carter and R. L. Knox, Jr., for Plaintiffs and Respondents.

GRIFFIN, P. J.—Plaintiffs, cross-defendants and respondents D. Clay Broadbent and J. R. Broadbent, brothers and copartners, doing business as Broadbent Livestock Company, a copartnership, brought this action against Modern Imperial Cattle Company, a corporation, alleging that on April 16, 1958, plaintiffs entered into a contract in writing with defendant whereby plaintiffs sold and delivered to defendant 974 head of cows and 43 head of bulls for which defendant agreed to pay plaintiffs $175 per head, or a total of $177,975; that no part of said sum has been paid to plaintiffs except $163,925, and that there is still due to plaintiffs the sum of $14,050. Two other counts seek said amount based on an account stated and an agreement to pay.

The claimed contract sued upon is set forth and is attached to the complaint. It provides generally that:

"Seller [plaintiff Broadbent Livestock Company] is now

the owner of a certain range herd, consisting of approximately three thousand head of cows and bulls, now located on the Matador Cattle Co., Trujillo Ranch, Amarillo, Texas.

"Seller hereby agrees to sell to Buyer [Modern Imperial Cattle Company] and Buyer hereby agrees to purchase from Seller, One Thousand (1,000) head of cows, and fifty-five (55) head of bulls, from said range herd. It is mutually agreed that said cows and bulls shall be *gate run,* from said herd . . .

"Seller agrees to pay to Buyer, the sum of One Hundred Seventy-five Dollars ($175.00) per head . . . payable Twenty Thousand Dollars ($20,000.00) upon the execution of this Contract of Sale. . . ." (Italics ours.)

The contract of sale was signed for Broadbent Livestock Company by Clay Broadbent and for Modern Imperial Cattle Company by James Delfino. Delfino was the authorized agent for defendant.

The terms "gate run" and "range herd" are commonly known and understood in the cattle business and the parties here agree that "range herd" means a herd of cows maintained for breeding purposes, including cows of all ages within the approximate range of 3 to 10 years. The term "gate run" is synonymous with the term "gate cut" and means that a selection is made at random, with no attempt to classify or grade the cattle as to quality or age, the identity of the particular animals received by such process being purely a matter of chance. If it is desired to separate one-third of an entire herd, a "gate run" would mean that all the animals would be run through a chute and one of each three would be selected at random and set aside for the purchaser of the one-third portion.

Defendant cross-complained against plaintiff and sought damages for claimed breach of the contract, for misrepresentation of the ages of the cattle and failure to deliver a portion of them. Defendant also seeks interpretation of the contract as finally agreed upon and for a declaration of rights. After hearing the evidence, the trial court found generally in favor of plaintiffs and against defendant on its cross-complaint, and rendered judgment for plaintiffs for $14,050.

## FACTS

Jay Broadbent testified that in April of 1958 the Broadbents purchased a range herd of cattle consisting of approximately 3,000 cows and 125 bulls, which was located on the 90,000-acre Matador Ranch near Adrian, Texas; that in March

of 1958, when he was reasonably sure that he was going to buy the cattle, he first contacted Delfino by telephone to see if Delfino would be interested in buying some cattle from the Broadbents if the Broadbents bought the entire herd; that he next talked with Delfino after the herd had been purchased in April 1958 and offered to sell a gate cut or gate run on the cattle of 1,000 head of cows at $175 per head and one-third of the bulls at the same price. He stated to Delfino that the cattle had been represented to him as being in the majority between 3 and 6 years of age, with some older cattle in the herd; that Delfino said he would take 1,000 head of cows and one-third of the bulls; that after this conversation with Delfino, Jay Broadbent took an ocean voyage, returning approximately May 1; that before leaving on the trip, Jay related to his brother Clay Broadbent the substance of the conversation with Delfino as previously related.

Clay Broadbent testified that he had never seen the cattle and that he first learned that his brother had purchased them in a telephone conversation with Jay; that he was instructed as to the terms of the agreement with Delfino and was told to have a written contract prepared for Delfino's signature and to receive a deposit of $20,000 on the purchase price; that he then caused to be prepared the typewritten portion of plaintiff's exhibit one, attached to the complaint, and presented it to Delfino for signature on April 16, 1958; that at that time he knew his brother Jay had embarked on an ocean voyage and would be unavailable for approximately two weeks; that he handed the contract to Delfino and Delfino stated that the contract was not correct and that the cows were to be mostly 2, 3 and 4 years of age, with none over 6 years of age, and that Jay had agreed to such a condition; that he said to Delfino that if Jay had agreed to such a condition, then it could be added to the typewritten portion of the contract; that thereupon Delfino's bookkeeper wrote by hand at the bottom of page one of plaintiff's exhibit one the age warranty clause:

"Seller also warrants that the cows shall be native hereford cows not to exceed six years old, the bulk of the cows to be two, three and four year olds."

The written contract was thereupon executed by Clay Broadbent and Delfino.

Jay Broadbent testified that he first saw the written contract early in May; that immediately he telephoned Delfino and told him that the handwritten age warranty clause was not in accordance with their agreement and that the contract

was impossible to fulfill; that Clay told Delfino that if he insisted on the age warranty the Broadbents had no alternative but to void the contract and return the $20,000 deposit, to which Delfino replied that the deal was okay and that he would buy the cattle; that he (Jay) next talked with Delfino in October of 1958 and he again told Delfino that no cattle would be delivered unless the age warranty clause was removed from the contract; that he again offered to return the $20,000 deposit and Delfino stated that it wasn't necessary; that he next talked with Delfino on October 19, 1958, immediately prior to the time when delivery of the cattle was to commence and he again advised Delfino that no cattle would be delivered unless the handwritten warranty was stricken and again offered to return Delfino's $20,000 deposit.

Thereupon defendant company penned in ink on the typewritten contract the words:

> "I hereby release the partys [sic] concerned from warranty of age clause written on contract of sale dated April 16, 1958 by and between Imperial Cattle Co. and Broadbent Livestock Co. and hereby release them from any liability under this clause.
>
> > Modern Imperial Cattle Co.
> > By James Delfino
> > . . . . . . . . . . . . . . . ."

The age warranty clause was crossed out and initialed and delivery of the cattle was effected to defendant and two other purchasers by the one-third "cut out" method.

Plaintiff Clay Broadbent claims that defendant's agent, Delfino, wrongfully and knowingly misrepresented to him that his brother Jay agreed that the cows would not exceed 6 years in age and that the bulk of the cows would be "two, three and four year olds," and accordingly the insertion of that clause, which was subsequently cancelled, was not enforceable. The trial court so found. Defendant claims that he was compelled to cancel the age warranty clause because plaintiffs had him in a position where he could not refuse, because he had already sold these cattle to another purchaser and was therefore forced to sign the waiver or release of plaintiffs as to the warranty of age.

The evidence as to the age of the cattle varied. Plaintiffs produced testimony of one Veigh Cummings, who was in the livestock business, that he went to the ranch in March

1958, prior to the sale to plaintiffs, to inspect the cattle because he had heard they were for sale; that the then owner described the cattle to him and said that the bulk of the cows were 3 to 6 years old, with maybe 10 to 15 per cent over 6 years of age; that he inspected them on two different occasions (about 2,000 head) and he concluded that the bulk of the animals were 3 to 6 years of age, with approximately 10 to 15 per cent over 6 years of age. He said he was also present when the cattle were rounded up for delivery to defendant in the manner indicated.

One Johnny Cavitt, employed by the Matador Ranch from 1948 to January 1960, testified that it was the practice, in maintaining the herd on the Matador Ranch, to "cull" it each year, taking out all old cows and bad cows and putting in replacement heifers; that in January and February of 1958 all cattle were gathered and culled and the old cows and bad cows were sold off the ranch in February; that the Broadbents purchased approximately 3,050 head of cows in April of 1958 and that there were no 2-year-old animals in the herd; that the age make-up of the herd was between 560 and 570 3-year-olds, between 400 and 500 4-year-olds, between 400 and 500 5-year-olds and between 1,228 and 1,250 6-year-olds, and the balance of the cows in the herd were over 6 years of age. He also testified that the herd was uniform and that if one could see as many as 20 head of the herd he would have a good idea of what the entire herd was like in age and quality. His testimony with respect to the age of the cattle is summarized on cross-examination to the effect that between 2,588 and 2,820 of the animals were 6 years of age or less.

A livestock appraiser for the bank testified that he appraised more than 100,000 head of cattle per year and that he appraised the Broadbent cattle on the Matador ranch in July of 1958; that he counted the animals from the air and personally examined between 500 and 600 cows, plus calves and bulls, from the ground; that it was his opinion that approximately 90 per cent of the cows were 6 years of age and under and the balance were 7, 8 and 9 years of age. He made a written report of this appraisal, which was introduced in evidence without objection. He testified that he could tell, within two years, the age of an animal by looking at it, and that he inspected at least 100 actual age brands and concluded that they were properly marked as to age. He described in detail the manner in which he determines the age of an animal by observing it and that the teeth of an animal are not a reliable index to age if the animal is more than 4 years old.

One Benjamin Snure testified that he inspected the animals on the Matador Ranch in September 1958 and saw approximately 700 head at that time; that during the two-hour inspection approximately 600 head of good quality cows were indicated; that they were of various ages, from 3 years on up, and that after inspecting them he contracted to purchase 1,000 head from Delfino by a contract dated October 10, 1958.

One Kelly Owens testified that he has been in the livestock business all his life; that he purchased 1,000 head of cows from the 3,000 in the Matador Ranch herd; that he took delivery of the cows he purchased commencing in October of 1958; that the cows were being delivered to him, Delfino and one Gene McCart; that the delivery was accomplished by sending the cows down a chute, one cow going to one pen and two cows to another pen; that he and McCart divided the cows going into the other pen and the remainder were delivered to Delfino; that he paid $195 per head for the cows he purchased; that he purchased the cows after seeing a representative group of 300 or 400 from the entire herd; after an inspection of an hour and a half or two hours; that he did not make any age count on the cattle, but only observed that they were "threes to eights" with possibly some a little older, and he felt that he could make more money doing something else than counting the ages of various cows.

Delfino testified that the cattle were delivered to him by plaintiffs as being from 3 to 6 years old, with approximately 10 per cent over 6 years old; that he and his foreman saw the cattle on the ranch in September and that he then saw about 600 head of all ages.

Defendant produced a chart (exhibit B) which purports to be a test record taken on December 10, 1958, for brucellosis of cows, on blank forms of the U. S. Department of Agriculture. The age of each cow tested is indicated thereon. The test was conducted by Ben Snure, the resale buyer of the cattle from defendant, and one Dr. R. E. Simmons, of the 974 cows received by Snure. Eight hundred eighty-six were tested for brucellosis. They examined both the brand marks, which indicated the year of birth of the cow, and also the condition of the teeth. They listed the ages of the 883 cows tested as four cows aged 2 years, 54 cows aged 3 years, 119 cows aged 4 years, 88 cows aged 5 years, 155 cows aged 6 years, 152 cows aged 7 years, 126 cows aged 8 years, 102 cows aged 9 years, 51 cows aged 10 years, 25 cows aged 11 and eight cows aged 12 years.

Defendant claims that this chart affirmatively shows that a majority of the tested cows were 7 years of age or over and accordingly the testimony of plaintiffs' witnesses was inaccurate and should be rejected and that it would not support the findings of the court in this respect.

In reply, plaintiffs point out that exhibit B should never have been received in evidence over objections, since no proper foundation was ever laid for its competency and that it consists largely of hearsay; that there is nothing official about the exhibit and it is not an official record of the Arizona Department of Agriculture; that Dr. Simmons, who participated in its preparation with defendant's witness Snure, was not an official of the Arizona Department of Agriculture, but was only a veterinarian who then resided in Arizona. He did not testify as a witness and no showing was made as to why he was not produced. Snure testified that in making the examination as to how the ages were ascertained, either Dr. Simmons observed the age brand and told Snure to write it down, or vice versa, and that if Dr. Simmons made the observations Snure had no way of knowing whether he observed correctly or not; that without the testimony of Dr. Simmons, there was no way of determining any of the ages set down by Snure.

The court found generally that the age warranty clause of the contract was no part of the agreement; that the portion of the contract waiving and releasing the age warranty clause was duly executed by Delfino on behalf of defendant; that it would be practically impossible to "gate run" 1,000 head of cows from a herd of 3,000 and meet the requirements of the age warranty clause; that the clause is repugnant to and irreconcilable with the other provisions of the contract of sale which require only gate-run delivery from a range herd; that the only oral representations made to defendant by plaintiffs, as to the age of the cattle in question, was to the effect that the bulk of the cows were from 3 to 6 years of age, with approximately 10 per cent or thereabouts over 6 years of age; that the herd of cows in question was in fact as thus represented; that the cattle were divided fairly and in accordance with the terms of the contract of sale and plaintiffs in all respects complied with all the terms and conditions of the contract of sale as orally agreed to and as represented by the typewritten portion of the contract of sale; that the cattle delivered were in fact as represented by plaintiffs; and that the fair market value thereof exceeded the agreed purchase price. Judgment was entered accordingly.

It appears that defendant also prepared and submitted proposed findings, which the trial court rejected. Defendant claims error in this respect and argues that the trial court's denial of its motion to vacate the signed findings, and its denial of its motion for a new trial, were equally erroneous. The evidence fully supports the findings made.

We are here again confronted with the too-often ignored rule that where the findings are attacked for insufficiency of the evidence, our power begins and ends with a determination as to whether there is any substantial evidence to support them; that we have no power to judge of the effect or value of the evidence, to weigh it, to consider the credibility of the witnesses, or to resolve conflicts in the evidence or in the reasonable inferences that may be drawn therefrom. (*Overton* v. *Vita-Food Corp.*, 94 Cal.App.2d 367, 370 [210 P.2d 757]; *Brewer* v. *Simpson*, 53 Cal.2d 567, 583 [2 Cal. Rptr. 609, 349 P.2d 289].)

The trial court was justified in finding that the age warranty clause was inserted in the contract by reason of fraud and deceit practiced by Delfino. (Civ. Code, § 1572.)

The written contract was presented to Delfino by Clay Broadbent in the absence of his brother Jay and Delfino took advantage of the situation by telling Clay that Jay had agreed to the age warranty clause, when in fact he had not. Delfino knew that Clay would have no means of immediately checking the truth of Delfino's representation because Jay was on an ocean voyage and not expected to return for approximately two weeks.

The release striking that clause might well support this finding as well as declaring defendant's intention to strike it from the contract. If this age warranty provision had been left in the contract, it would have been repugnant to the provision therein that the selection of the cattle would be by means of a "gate run," as that term is here understood. (12 Cal.Jur.2d, § 147, p. 361; *Burns* v. *Peters*, 5 Cal.2d 619 [55 P.2d 1182].)

As to defendant's exhibit B, even though received in evidence, it might well have appeared to the trial court that the method of keeping tally of the count there recorded did not establish as a conclusive fact that the ages of the cattle thus recorded were correct. The corroborating testimony of Dr. Simmons was lacking. In any event, it merely created a conflict.

The court, from the evidence, was not obligated to consider

the report as an authentic record of the U. S. Department of Agriculture, of which the court must take judicial notice. Regardless of this, the question of the weight of the evidence was for the trial court to determine. (*Silva* v. *Patterson*, 195 Cal.App.2d 714, 719 [16 Cal.Rptr. 22].) The trial court was authorized to reject defendant's proffered findings and deny its motion to set aside the findings and its motion for a new trial.

Judgment affirmed.

Shepard, J., and Coughlin, J., concurred.