[Civ. No. 2411. Fifth Dist. Jan. 27, 1977.]

HUBER, HUNT & NICHOLS, INC., Plaintiff and Appellant, v.
RICHARD R. MOORE et al., Defendants,
Cross-complainants and Appellants;
BRANDOW & JOHNSTON ASSOCIATES et al.,
Cross-defendants and Respondents.

**COUNSEL**

Rushing, Ames & Norman, Conrad L. Rushing and Steven Perryman for Plaintiff and Appellant.

Jones & Wilson and George W. Coleman for Defendants, Cross-complainants and Appellants.

Stanley H. Tibbs, Stammer, McKnight, Barnum & Bailey and Dean A. Bailey for Cross-defendants and Respondents.

**OPINION**

**LORING, J.***—Huber, Hunt & Nichols, Inc., an Indiana Corporation (Contractor) filed an action in Santa Clara County against The Fresno City-County Community and Convention Center Authority (Owner), the City of Fresno (City) and County of Fresno (County) and Richard R. Moore, Robert W. Stevens, Robert W. Stevens Associates and Robert Stevens Associates and Adrian Wilson Associates, a joint

---

*Assigned by the Chairman of the Judicial Council.

venture (collectively Architects) to recover damages allegedly sustained as the result of the construction of a convention center complex in the City of Fresno. Defendant's motion for change of venue to Fresno County was granted. The demurrer of Architects was sustained as to all causes of action except causes of action seven (negligence) and ten (indemnity). Owner filed a cross-complaint against Robert W. Stevens Associates to recover any moneys owner was obligated to pay Contractor.

Architects filed a first amended cross-complaint against Brandow & Johnston Associates, structural engineering consultants (Structural Engineers) and McDougald & Leino, electrical engineering consultants (Electrical Engineers) for indemnity.

At the outset of trial, the case was settled by Contractor as to Owner, City and County and the action as to said defendants was dismissed with their consent with prejudice. Owner then dismissed its cross-complaint against Stevens Associates with prejudice. The case proceeded against Architects, Structural and Electrical Engineers. By informal agreement of counsel a judgment of nonsuit was rendered against Architects on their cross-complaint against Electrical Engineers for indemnity at the conclusion of plaintiff's case. After 74 trial days the jury returned a verdict in favor of Architects and against Contractor. The court declared a judgment in favor of Structural Engineers on Architects' cross-complaint. On Architects' motion to tax costs, the trial court disallowed certain items of costs claimed by Architects.

Contractor appeals from the judgment on the jury verdict in favor of Architects, the Architects appeal from the order and modification of order disallowing certain costs and from the judgment of nonsuit and judgment on jury verdict on their cross-complaints against Electrical and Structural Engineers.

Before defining the issues on appeal, it is first appropriate to consider the factual context out of which these cases arise.

Prior to February 1962, City decided to build a convention center complex consisting of three buildings connected by one roof—a convention center, a theatre and an ice rink—in the City of Fresno. City entered into a contract with Robert W. Stevens, dba Robert W. Stevens Associates, a licensed architect, to prepare the architectural plans and specifications. Later County joined City in the project and Fresno

City-County Convention Center Authority was created by a joint powers agreement between City and County executed under authority of Government Code, chapter 5, article 1, section 6500 et seq.

The architectural contract was assigned by City to Owner. As the magnitude of the project increased, Robert W. Stevens Associates entered into a joint venture agreement with Adrian Wilson Associates, a firm of licensed architects. After nine months of work by the Architects, the plans and specifications were approved and accepted by the Owner, checked and approved by city building department, building permits issued and public bids on them requested by the Owner. The bids were opened December 15, 1964, and Contractor's bid of $6,398,000 was the low bid.[1]

The low bid was approximately $1 million above the Architects' estimates. Owner was uncertain that it could finance the extra cost so it negotiated with Contractor on 50 or 60 possible modifications or alternatives which would reduce the overall cost of the project. The contract with the possible modifications or alternatives was awarded to Contractor and construction began January 25, 1965. The contract required completion within 500 days.

The contract contained a liquidated damages clause of $200 for each day's delay over 500. Owner took possession of the convention center in late September 1965 before the project was entirely completed.

The request for bids included the proposed contract which contained various provisions, some of the more relevant portions of which are set forth in the margin.[2]

---

[1]The bid reads in part as follows:

"The undersigned bidder, having carefully read and examined the complete specifications therefor, and having examined the site of the proposed construction, hereby proposes and agrees to furnish all labor and materials and perform all work required for the construction of the Fresno Community and Convention Center, all in strict accordance with the plans and specifications therefor on file in the office of the City Clerk of the City of Fresno, excluding items of work specified therein to be done pursuant to separate bids, at the following prices:

BASE BID: 6,398,000.00 DOLLARS"

[2] "INSTRUCTIONS TO BIDDERS

"10. Before submitting a bid, each bidder shall carefully examine the drawings, read the specifications, the agreement form, and other contract documents, shall visit the site of the work and shall fully inform himself as to all existing conditions and limitations,

Under the proposed contract terms as incorporated in the bid forms, the Contractor was required to carefully examine and familiarize itself with the plans and specifications and site and call the Architects'

and shall include in the bid a sum to cover the cost of all items included in the contract. The bidder is required to bid on all items called for in the proposal form.

". . . . . . . . . . .

"16. The bidder acknowledges by the submission of his bid that he has satisfied himself as to the nature and location of the work, the general and local conditions, conditions of the site, availability of labor, electric power, water, and the kind of surface and subsurface materials on the site, the kind of equipment needed, and all other matters which may in any way affect the work or the cost. Any failure of the bidder to acquaint himself with all of the available information concerning conditions will not relieve him from responsibility for estimating properly the difficulties or cost of the work.

"17. Should a bidder find discrepancies in, or omissions from, the drawings or specifications, or should he be in doubt as to their meaning, he shall at once notify the Architect, and should it become necessary, a written Addendum or Bulletin of instructions will be sent to all bidders. Bidders should act promptly and allow sufficient time for a bulletin to reach them before the submission of their bid. Neither Owner nor Architect will be responsible for any oral instructions.

"18. Bulletins or addenda furnished by the Architect interpreting the plans and specifications or answering questions of intended bidders, including all modifications thereof, shall be incorporated in the contract documents before the execution of the agreements.

". . . . . . . . . . . .

"GENERAL CONDITIONS
"5. SUPERVISION:
"a. The Architect shall have the general supervision and direction of the construction operation. He shall have the right to accept or reject materials or workmanship, to decide the amount due at each payment period, and to determine when the Contractor has complied with the conditions of the Contract.

". . . . . . . . . . .

"33. DRAWINGS AND SPECIFICATIONS:
"a. The General and Special Conditions apply with equal force to all of the work, including extra work authorized.

"b. For convenience, these specifications are arranged in the several sections indicated, but such separation shall not be considered as the limits of the work required of any separate trade. The terms and conditions of such limitations are wholly between the Contractor and his subcontractors.

"c. Interpretation: In general the drawings will indicate dimensions, position and kind of construction, and the specifications will indicate qualities and methods. Any work indicated on the drawings and not mentioned in the specifications, or vice versa, shall be furnished as though fully set forth in both. Work not particularly detailed, marked or specified, shall be as similar parts that are detailed, marked or specified.

"d. Should an error appear in the drawings or specifications, or in the work done by others affecting this work, the Contractor shall notify the Architect at once and the Architect will issue instructions as to procedure. *If the Contractor proceeds with the work so affected without instructions from the Architect, he shall make good any resulting damage or defect.* This includes typographical errors in the specifications and notational errors on the drawings where doubtful of interpretation.

". . . . . . . . . . . .

"34. ADDITIONAL DETAILS:
"a. The Architect will furnish additional details where necessary to more fully explain the work, and same shall be considered a part of the contract. Full size details

attention prior to bid to any discrepancies in or omissions from the drawings or specifications and if appropriate, amendments would be issued to all bidders prior to bid. The contract documents contemplated

shall take precedence over scale drawings. Any work done before receipt of such details, if not in accordance with same, shall be removed and replaced or adjusted, as directed, without expense to the Owner.

"b. Should any details be, in the opinion of the Contractor, more elaborate than scale drawings and specifications warrant, written notice thereof shall be given to the Architect within five (5) days of receipt of same. The claim will then be considered, and if justified, said drawings will be amended or the extra work authorized. Non-receipt of such notice relieves the Owner of any claim.

"

"37. . . . . . . . . . . . . . . . . . . . . . .

"c. Where the words 'or equal,' 'equal to,' 'as selected,' 'approved,' or other synonymous terms are used in reference to material, quality, methods or apparatus in lieu of or in addition to other specific references, *it is to be distinctly understood that the approval of any such substitutions is vested in the Architect whose decision shall be final and binding upon all concerned.*

"

"40. CHANGES IN THE WORK:

"a. The Owner may, at any time during the progress of the work, request any alterations, deviations, additions, or omissions from the contract, specifications, or plans by change order as herein provided, and such changes shall in no way affect or make void the contract, but will be added to or deducted from the contract price by a fair and reasonable valuation. The value of any such extra work or change shall be determined in one or more of the following ways:

"(1) By estimate and acceptance in a lump sum.

"(2) By unit price named in the contract or subsequently agreed upon.

"(3) By cost and percentage or by cost and fixed fee.

"b. If none of the above methods is agreed upon, the Contractor, provided he receives an order as above, shall proceed with the work. In such case and also under (3) above, he shall keep and present, in such form as the Architect may direct, a correct account of the net cost of labor and materials, together with vouchers. In any case, the Architect shall certify to the amount, including a reasonable allowance for overhead and profit, due to the Contractor for extra work, or deductible for deletions or changes which reduce the value of the work. Pending final determination of value, payments on account of changes shall be made on the Architect's certificate. No extra work shall be performed or change be made unless in pursuance of a written order from the Owner, approved by the Architect, stating that the extra work or change is authorized and *no claim for an addition to the contract sum shall be valid unless so ordered.*

"c. *Changes, omissions or additions shall be made only through a standard written order of the Architect and approved by the Owner.*

"d. Change orders shall be issued only before or at the time of change, *and the expense or responsibility for any change or damage without said. order shall rest entirely with the Contractor.*

"e. Any change in the work shall be performed according to the original drawings and specifications insofar as same may be applied without conflict to conditions set forth by the change order.

"

"SPECIAL CONDITIONS:

"

"9. MODIFICATION OF SPECIFICATIONS: The Contractor shall notify the Architect of any conditions he may find where, in his judgment, it would be desirable to

that the Architects' plans or specifications might contain errors or omissions and as interpreted by the parties it provided for a process which would enable the Contractor to obtain additional or supplemental information (information request I.R.) and propose changes including estimates of the cost and time for performance (change estimate C.E.) and the Owner to issue change orders (C.O.) which would specify the work to be performed, the price to be paid and the time allowed for the additional or changed work. Each C.O. was approved by the city council. The form of change orders used included a clause[3] in which the Contractor approved the change order and agreed that the sum specified was in complete payment of all work to be performed and materials to be supplied and which approved the time as extended. The Architects were designated in the contract as the sole arbiter regarding disputes which might arise between the Contractor and the Owner during the performance of the work.[4]

---

modify basic specified or detailed construction requirements to produce best results. If the Contractor fails to so notify the Architect, or if his recommendations for said modification are accepted, the Contractor assumes sole responsibility for satisfactory results.

"10. UNIT PRICES: The Contractor shall submit such additional unit prices on materials, labor, finishes, etc., as may be requested by the Architect and said unit prices shall be used during the progress of the work in computing cost of deducted or added work as determined by the Owner." (Italics ours.)

[3]The clause stated:

"The undersigned Contractor approves the foregoing Change Order as to the changes, if any, in the contract price specified for each item and as to the extension of time allowed, if any, for completion of the entire work on account of said Change Order, and agrees to furnish all labor and materials and perform all work necessary to complete any additional work specified therein, for the consideration stated therein. It is understood that said Change Order shall be effective when approved by the Lessee and ordered by the Owner."

[4]The clause regarding arbitration by Architects of disputes between Contractor and Owner read as follows:

"6. AUTHORITY OF ARCHITECT, SETTLEMENT OF DISPUTES:

"a. The Architect shall *decide all* questions which arise as to quality or acceptability of materials furnished and work performed and as to the manner of performance of the work; all questions as to acceptable fulfillment of the contract on the part of the Contractor; and all questions as to the amount of compensation due at each payment period. The Architect's decisions shall be final, and he shall have authority to enforce and make effective all such decisions and orders which the Contractor fails to carry out. The Architect neither warrants nor implies warranty of either materials or performance, relative to specified or selected materials and their total performance under the terms of this Contract.

"b. In the event of a dispute between the Owner or Architect and the Contractor as to any interpretation of any of the drawings and specifications, or as to the quality or sufficiency of material or workmanship, the decision of the Architect shall, for the time being, prevail, and the Contractor, without delaying the job, shall proceed as directed by the Arthitect [*sic*] without prejudice to a final determination by negotiation or litigation." (Italics ours.)

During the course of the work Contractor submitted 103 I.R.s, 187 C.E.s and the parties agreed on 25 C.O.s. However, the 25 C.O.s encompassed 124 C.E.s. The record is not clear as to what happened to the remaining 63 C.E.s, but presumably they were rejected by the Owner. Eight of the C.O.s[5] reduced the scope of the work resulting in deductions aggregating $152,544.41. Seventeen of the C.O.s increased or changed the scope of the work which resulted in additional charges to Owner aggregating $472,652.91. Certain of Contractor's records indicate that as of November 30, 1972, its total costs in connection with the convention center were $6,965,518 with an additional $72,500 estimated to complete the work.[6] Contractor's records[7] also indicate that as of November 30, 1972, its cost overrun was $337,505 which included a revised fee of $271,365.

At trial Contractor claimed that Architects' plans and specifications were negligently prepared, contained errors and omissions, and that as a consequence, Contractor was damaged. At trial Contractor also claimed that the Architects were dilatory and negligent in approving change orders, in approving shop drawings and in the overall supervision of the work, and, as a consequence, the overall project was delayed resulting in damages to Contractor.

Contractor sought to recover from Architects the sum of $732,521 which it claimed was its total damage.[8]

The issues to be tried by a jury had been framed by a pretrial order on August 1, 1972. By that pretrial order, the only cause of action asserted against Architects was a cause of action for simple negligence.[9] After the case had been called for trial and before the jury was empanelled, the trial court conducted hearings extending over several days to revise the

---

[5]C.O.s Nos. 1 through 7, and 17.

[6]This statement is based on plaintiff's exhibit 3 for identification hereinafter discussed in detail.

[7]*Ibid.*

[8]Various amounts of damages were claimed at various times in various pleadings, arguments, briefs, etc. The figure of $732,521 is derived from appendix A to Contractor's opening brief on appeal discussed in detail *infra* which appears to be its most recent claim.

[9]The original pretrial order reads in part:
"5. NEGLIGENCE OF ARCHITECT
 $676,431.00
"This Complaint is for the same items that are alleged in paragraphs 3 and 4, supra. The difference is that instead of being actions for breach of contract against the PUBLIC

pretrial order primarily to encompass issues raised by various cross-complainants. An amended pretrial order was signed on March 30, 1973. On that date counsel for Contractor and for Owner orally advised the court and counsel that the case of Contractor against Owner had been settled and a few days later, the action of Contractor against Owner was dismissed with prejudice. On April 6, 1973, during the course of further conferences, counsel for Contractor asserted that Contractor intended to make motions to include a cause of action against Architects for "negligent misrepresentation" and "intentional inference with contractual relationship." The court refused the request.[10] On April 10, 1973, counsel for Contractor made a formal motion to amend the pretrial order to include a cause of action against Architects for negligent

---

ENTITY, the action is against the architect for his negligence in preparing the plans and specifications and for delaying the project.

"The following acts of negligence by the architects are claimed:

"(a) Failure to properly, adequately and competently prepare plans and specifications for the Convention Center;

"(b) Failure to properly supervise the construction of the Convention Center;

"(c) Failure to properly advise the BUILDER with regard to changes in the drawings or the interpretation thereof;

"(d) Failure to make timely and proper responses to requests for information by BUILDER;

"(e) Failure to make themselves present at the job site;

"(f) Failure to promptly approve or disapprove change estimates submitted by BUILDER;

"(g) Failure to properly prepare structural steel drawings;

"(h) Failure to properly prepare electrical drawings;

"(i) Failure to properly prepare the plans for the cooling tower for the Convention Center;

"(j) Failure to properly prepare plans and specifications for the elevation of wall and footing foundations;

"(k) Failure to apply reasonable construction standards relating to tolerances for concrete;

"(l) Failure to coordinate the construction with segregated contractors, including contractors supplying seating and certain stage equipment;

"The foregoing acts of the architects resulted in general damages, as alleged above, in the amount of $500,000.00."

[10]The clerk's minutes of April 6, 1973, read in part:

"Mr. Conrad L. Rushing, counsel for the Plaintiff, states to the Court that he will submit a motion for a new cause of action on the issue of negligence of misrepresentation, and including it in the new Pre-Trial Conference Order, and the Court rules that the issue as proposed by the Plaintiff will not go into the Pre-Trial Conference Order, that it is not to mean however that the Plaintiff will not be pre-cluded [sic] under the Pre-Trial Conference Order from proposing Jury instructions and as the Court understands it, this was the Plaintiff's intial [sic] position, and the Court is of the opinion that this is a matter of proof."

An augmented reporter's transcript demonstrates that the court advised counsel that the giving of an instruction on negligent misrepresentation depended upon the production of evidence to substantiate such claim.

misrepresentation and an additional cause of action for interference with contractual relations. No proposed amended complaint was submitted.

A further amended pretrial order was signed on April 11, 1973, which did not include the requested causes of action for negligent misrepresentation and interference with contractual relations. The trial court's minute orders indicate that a jury panel had been originally called to try the case commencing on April 4, 1973, but this call was changed from time to time thereafter and the commencement of jury selection actually began on April 16, 1973.

## ISSUES RAISED BY CONTRACTOR

A. The court erred in striking and excluding evidence of architectural errors and omissions.

B. The court erred in excluding exhibit "03," IBM cost records.

C. The court erred in excluding all evidence relating to acceleration and profit.

D. The court erred in excluding certain evidence of damages.

E. The court erred in excluding evidence relating to the ice rink.

F. The court erred in striking evidence relating to shop drawings.

G. The court erred in refusing to instruct the jury on negligent misrepresentation and in refusing to allow evidence that the plans and specifications were not as represented.

H. The court erred in refusing to add interference with contractual relations to the pretrial statement.

## DISCUSSION

Contractor's eight assignments of error can be grouped into four basic categories:

1. Alleged errors regarding the trial court's refusal to allow Contractor to amend its pleadings;

2. Alleged errors regarding the admission of evidence;

3. Alleged errors regarding the appropriate rule of damages; and

4. Alleged error in refusing a jury instruction regarding negligent misrepresentation.

We discuss the claims of error in that order.

## RULINGS ON PLEADINGS

Contractor's initial complaint was filed in Santa Clara County on August 18, 1968.[11] On April 10, 1973, more than four and one-half years after the action had been filed and eight days after it had been called for trial and after a jury had been scheduled to be called, Contractor sought to amend the pretrial order to raise an entirely new cause of action—intentional interference with contractual relationship—without making any effort to explain, excuse or justify the delay. ■ Contractor's position here seems to be that it had an absolute right to amend to allege such new cause of action and the trial court had no discretion to consider the matter. Such is not the law.

"Even if a good amendment is proposed in proper form, unwarranted delay in presenting it may be a reason for denial.

"The cases do not always make it clear whether they rest upon (1) the subjective element of lack of diligence in discovering the facts or in offering the amendment after knowledge of them, or (2) the effect of the delay on the adverse party. But in most cases both factors are involved...." (3 Witkin, Cal. Procedure (2d ed. 1971) Pleading, § 1048, p. 2623.)

In *Moss Estate Co.* v. *Adler* (1953) 41 Cal.2d 581 [261 P.2d 732], the court said at page 585: "Although it is true, as defendant contends, that amendments should be liberally allowed so that all of the issues may be properly presented, the question whether the filing of an amended pleading should be allowed at the time of trial is ordinarily committed to the sound discretion of the trial court. (Code Civ. Proc., § 473.)"

---

[11]The record on appeal here does not include the initial complaint, but does include an order of the Superior Court of Santa Clara County dated October 24, 1968, granting defendant's motion for change of venue to Fresno County. However, we take judicial notice of the fact that the original complaint was filed in Santa Clara County on August 18, 1968.

In *Hunt* v. *Smyth* (1972) 25 Cal.App.3d 807 at 828 [101 Cal.Rptr. 4], the court said: " 'The policy of great liberality in permitting amendments at any time under section 473 is well established, but when an order granting or denying leave to amend is attacked on appeal an additional policy applies: the reviewing court will uphold the trial court's action unless an abuse of discretion is clearly shown. . . .' In *People* ex rel. *Dept. Pub. Wks.* v. *Jarvis, supra* [274 Cal.App.2d 217 (79 Cal.Rptr. 175)], the court, in upholding a denial of leave to amend made 16 months after the complaint had been filed and after a pretrial conference, noted: 'The trial court is entitled to be "skeptical of late claims" (*Plummer* v. *Superior Court, supra,* [(1963) 212 Cal.App.2d 841 (28 Cal.Rptr. 294)] at p. 844); and long-deferred presentation of a proposed amendment, without a showing of excuse for the delay, is a significant factor in support of the trial court's discretionary denial of leave to amend. [Citation.]'. . . ."

Contractor's attempt to amend the pretrial order to allege a cause of action for intentional interference with contractual relationship attempted to allege an entirely new and different cause of action for the first time after the case had been called for trial, more than four and one-half years after the original complaint was filed and more than eight years after the wrong complained of, without any explanation, excuse or justification for the delay. The attempted amendment was within less than five months of the mandatory dismissal date.

The alleged cause of action for intentional interference with contractual relationship which Contractor attempted to file more than eight years after the wrong complained of was based upon a set of facts which were at least partially new and the cause of action may well have been barred by the statute of limitations (3 Witkin, Cal. Procedure (2d ed. 1971) Pleadings, §§ 1079, 1080, pp. 2655-2658), a factor which the trial court could and presumably did consider. Obviously such an amendment would have required a delay in the trial with the consequent risk that the case might not be tried within the five-year-mandatory dismissal period. There is no showing here that the trial court abused its discretion in refusing the amendment. The claim of error is devoid of merit.

■ What we have said applies with equal force to the Contractor's attempt to amend the pretrial order to allege a cause of action for negligent misrepresentation with this exception—Contractor claims that this proposed amendment did not state a new cause of action because the

original cause of action against Architects for negligence as alleged in the pleadings and in contemplation of law was also an allegation of negligent misrepresentation by the Architects. Assuming without deciding that Contractor's contention in this regard is correct, no prejudice could result from the denial since the proposed amendment added nothing to the cause of action. In the final analysis, therefore, this contention has no relevancy except in connection with the issues regarding the admission of evidence and with the issue of jury instructions which are discussed *infra* under separate headings.

## RULINGS ON ADMISSION OF EVIDENCE

We next consider Contractor's claims of error regarding the rulings of the trial court concerning the admission of evidence.

■ In its closing brief on appeal Contractor described plaintiff's exhibit 3 for identification as ". . . the *single* piece of evidence which proved or tended to prove that the effect of the architects' errors and omissions was to increase job costs in the categories used by plaintiff." (Italics ours.) In oral argument on appeal, Contractor made the same concession. In view of this concession by Contractor, we first examine the court's ruling excluding plaintiff's exhibit 3 for identification from evidence. Plaintiff's exhibit 3 is described in the margin.[12]

The court concluded that the computer read out (plaintiff's exhibit 3) would be unintelligible to the jurors without additional evidence such as oral testimony to explain it. The court indicated that it would permit any qualified witness to testify from the document orally.[13] Counsel for

[12]Plaintiff's exhibit 3 is a computer read out consisting of pages approximating 11 inches × 15 inches in size which in the aggregate are 3 inches thick. Each page consists of various columns containing words or figures arranged under the following headings: "Cost Code" (under which appear the numbers for 200 different items); "Description" (under which appear one to three words describing the 200 different items such as "Tectun Decks," "Dasher Board inserts," "Dasher boards," "Insulation AC tile," "Allowances," "Metal Deck and siding," "Steel joists," "Struct. Steel," "Sheet Metal," "Roofing," "Roof Hatches and vents," "Lath and plaster," "Masonry," "Paving," "Filler Panels," "Millwork," "Misc. Matl," "Commitments," "Backcharge sales," and other words of a similar or dissimilar nature); "Construction Budget"; "Budget Changes" with subheadings "Initial," "Final," "Current Budget"; "Costs" with subheadings "To Date," "To Complete," "Overrun/Underrun"; "Variance" with subheadings "Fm.," "Prev.," "Mo."

[13]The court explained to counsel its reasons as follows:

"THE COURT: Well, I'm going to treat this in this manner: assuming that the foundational requirements are testified substantially as outlined by Mr. Rushing, I'm going to admit the computer printout—I'm going to have it marked, rather, as an exhibit

Contractor conceded in the court below that there may be risk of "wrong conclusions . . . about what it shows."

Evidence Code section 350 provides that "[n]o evidence is admissible except relevant evidence." Evidence Code section 352[14] empowers the court to exclude evidence (otherwise admissible) if its probative value is substantially outweighed by the probability that its admission will create substantial danger of confusing the issues or of misleading the jury. Even prior to the adoption of Evidence Code section 352, the trial court had wide discretion in determining the relevance and consequent admission of evidence. (*Adkins v. Brett* (1920) 184 Cal. 252 [193 P. 251]; *Broadbent v. Modern Imperial Cattle Co.* (1962) 208 Cal.App.2d 433 [25 Cal.Rptr. 92]; *People v. Hess* (1951) 104 Cal.App.2d 642 [234 P.2d 65], app. dism. 342 U.S. 880 [96 L.Ed. 661, 72 S.Ct. 177]; *Spolter v. Four-Wheel Brake*

for identification. I'm then going to permit the witness to testify from the document. But the document itself, the printout itself, will not be—will not go to the jury. And I do that for this reason: that a lay juror is not qualified, and I so find, to interpret a computer printout; that by allowing that document to go to the jury, that the Court would take the risk that the jury would misinterpret the document, just as the same reasoning that has been applied by the Court with reference to x-ray films, for example.

"...................

"MR. RUSHING: Let me ask the Court one further question, if I may. May I be permitted, if it is not going to go to the jury, to prepare a chart showing the category of work—categories of work? That I deem relevant.

"THE COURT: Supported by the evidence. I'm not saying it would be admissible in evidence, but there is no reason you couldn't use it in argument.

"MR. RUSHING: Well, I want to use it in my argument. This is not a particularly easy area of the case, I think, for any of us. It's a matter that takes considerable care in going through it. *And if one mis-steps; and makes sort of a category case about codes and categories, and things like that, you will come out wrong in the conclusions about what it shows.*

"THE COURT: I don't think I can answer your question until I see what you are offering." (Italics ours.)

The court admonished the jury as follows:

"THE COURT: Very well. It is the order of the Court that the exhibit, which has previously been marked as Plaintiff's Exhibit 3 for identification, not be received into evidence. It is further ordered, however, that the Witness, this witness, or any other witness, may refer to the document, and testify concerning matters contained therein, and by reference to the matters contained in the document. I would like to explain, ladies and gentlemen, the reason for my ruling.

"The court finds that this exhibit, which consists of printouts from a computer, is a matter which requires interpretation, and that neither the Court nor the jury is qualified to interpret the documents. And it is necessary, therefore, to have a witness who is qualified to testify concerning the documents and the interpretation of matters contained therein. That is the reason I'm not admitting it into evidence, but am ordering that it may be referred to by this witness and any other qualified witness."

[14]Evidence Code section 352 reads as follows: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

*Serv. Co.* (1950) 99 Cal.App.2d 690 [222 P.2d 307]; *Gladstone* v. *Fortier* (1937) 22 Cal.App.2d 1 [70 P.2d 255].)

In our view Contractor does not demonstrate here that the trial court abused its discretion in refusing to receive plaintiff's exhibit 3 for identification in evidence. We have examined plaintiff's exhibit 3 and we conclude that the document is unintelligible particularly with reference to its possible probative value as to the issues of this case without any oral evidence explaining how it relates to the issues in this case.

Aside from the obvious difficulty that a lay jury would have in reading and understanding such a complex document and correlating it with the issues involved in this case, there was great risk of misinterpretation as counsel for Contractor conceded. For example, we find in examining plaintiff's exhibit 3 for identification that as of "11/30/72" the total "costs" "to date" were "6,965,518" with "72,500" required "to complete." We also find what appears to be a separate set of calculations entitled "Detail Cost Sheet" which indicates that as of "11/30/72" the "Total Cost to Date" was $5,828,650.68." One month later on "12/31/72" the total "costs" "to date" were "5,132,173" with "72,500" required "to complete." If a jury were to accept the latter two figures at face value it would appear obvious that Contractor suffered no damage in any manner whatsoever but made a very substantial profit in excess of its "fee" as originally budgeted. Presumably there is an appropriate accounting explanation for these various discrepancies and apparent conflicts, but they illustrate the point that the document was subject to possible misinterpretation without explanatory evidence and they demonstrate the wisdom of the trial court's ruling. We find no prejudice resulting from the ruling with reference to plaintiff's exhibit 3 for identification in any event inasmuch as the record is clear that Contractor was permitted to produce any qualified witness to testify orally from plaintiff's exhibit 3. Contractor did produce a witness—Bruce Bennett, its contractor manager. Bennett attempted to testify from plaintiff's exhibit 3 for identification but the sum and substance of his proferred testimony was merely to attribute every cost overrun to the fault of the Architects without discrimination as to other possible causes. He was admittedly compelled to do this because plaintiff's exhibit 3 included extra costs within total costs without discrimination or segregation and without explanation as to causation. We note in the margin a

colloquy between court and counsel which illustrates the problem.[15] It is manifest that counsel for Contractor merely wanted to dump into the record all data from the computer printout including cost overruns without reference to or any consideration whatsoever of the issue of causation.

We think the wisdom of the trial court's ruling is also illustrated by reference to Appendix A attached to Contractor's opening brief on appeal, a copy of which is appended to this opinion. Contractor represents to us that the material designated on Appendix A has been extrapolated from plaintiff's exhibit 3 and Contractor alleges that Appendix A in effect proves Contractor's case. A reference to Appendix A demonstrates the fallacy of Contractor's contention. Take for example, item "1525" "Drinking water." A reference to plaintiff's exhibit 3 for identification indicates that Contractor originally estimated the cost of drinking water at $1,000, but $2,293 was expended resulting in an overrun (OR) of $1,293 which Contractor alleges is one item of its damage which it seeks to recover from Architects. In order to arrive at that conclusion, the jury would have to assume at least four elements of proof:

1. That Contractor's original estimate of $1,000 for drinking water was an accurate estimate;

---

[15]Bennett was testifying regarding the costs of additional footings made necessary because allegedly the plans and specifications did not include specific elevations. The court asked Bennett what figures he was going to give from plaintiff's exhibit 3. Bennett replied that they would include all of the costs on all footings during a particular month indicating that there "is no way absolutely no way" that he could break out cost data attributable to alleged errors in elevation. A colloquy then ensued during the course of which the following occurred:

"THE COURT: All right. As I understand the evidence so far, Mr. Bennett included in each one of these anything that would have exceeded the initial budget.

"MR. RUSHING: That's correct.

"THE COURT: Isn't that right?

"MR. RUSHING: Yes.

"THE COURT: All right. Now, don't you have to show that all of these exceptions were in some way related to the claimed errors and omissions and the requirements contained in IR 10? Doesn't that necessarily follow?

"MR. RUSHING: Your Honor, all exceptions?

"THE COURT: All extra corts.

"MR. RUSHING: Okay.

"THE COURT: Doesn't that necessarily follow?

"MR. RUSHING: Yes. I mean, that is what we are attempting to do.

"THE COURT: But you haven't done it.

"MR. RUSHING: I'm painfully aware of it.

"THE COURT: And I'm not sure you can. And this IR 10 is only one. It merely points it up, because if the extra costs of lowering the footings referred to in IR 10 are included

2. That the overrun of $1,293 in the cost of drinking water was proximately caused by errors and omissions in the Architects' plans and specifications;

3. That *said* errors and omissions in the Architects' plans and specifications were proximately caused by Architects' negligence; and

4. That the overrun of $1,293 was not due to other delays caused by change orders, inclement weather or strikes (of which there were several).

When we consider that Contractor concedes on appeal that it really did not take the time to plan check the plans and specifications prior to bid as it was required to do by the terms of the bid and as it represented to Owner by its bid that it had done, the jury would have been required to assume more than was justified by the facts if it was required to assume that Contractor's original estimate of $1,000 as the cost of drinking water was an accurate estimate. There was substantial evidence in the court below (defendants' witness Clarence Vernon Holder) that Contractor's initial bid on many items of labor or material or both was too low. We note in the margin some of the testimony.[16] When we also consider that 8 of the 25 C.O.s were designed to reduce the overall costs of the project, apparently pursuant to the alternatives and changes which Owner negotiated with Contractor before executing the contract, it is manifest that not all delays were attributable to the Architects' alleged negligence. Furthermore some of the delays were caused by Contractor's own mistakes or incompetence.[17] The same fallacy applies to most of the

in the total figures, which we know they are, then they most certainly must be broken out from the total figure."

[16]"Q. Last item, flat slabs, did you observe any flat slabs at the Convention Center?
"A. Yes, I did.
"Q. All right. I want to ask you to assume that there are 6,167 square feet of these slabs, and that the contractor originally estimated that his costs of doing this work would be fifty cents per square foot, and actual costs of doing the flat slab work was $1.30 per square foot. Can you tell me, first, whether or not you can form any opinion as to the fifty cent estimate?
"A. Yes, I can.
"Q. Can you tell us what the opinion is?
"A. My opinion, the unit is—doesn't properly represent the cost of the work involved.
"Q. All right. In other words, it's too low?
"A. Too low.
"Q. Can you form an opinion with regard to the $1.30 cost of actually doing the work?
"A. I think that is a reasonable unit."

[17]For example, one problem which caused delay was the deviation in excess of ¼ inch in the face of the risers to which the American Seating Company seats were to be bolted (discussed *infra*) which may well have been caused by the slippage of Contractor's forms

other items of claimed damage as shown by Appendix A. Appendix A demonstrates that Contractor is still, at this late date, oblivious to the basic issue of causation.

We think there is also a fifth element of proof that the jury would have to assume in order to award $1,293 damages to Contractor because of the overrun on the cost of drinking water, namely, that the Contractor's damage, if any, *was* not compensated for and *could* not be compensated for by the change order process. On each change estimate Contractor included direct costs of labor and material and a factor for administration and overhead (usually 10 percent although sometimes 15 percent) and a factor (usually 10 percent) for profit. We see no legal reason why Contractor could not include the cost of additional drinking water in effecting a specific change pursuant to a specific change order. Additional drinking water was either a direct cost or an indirect cost of the performance of each change order and in either event the estimated cost should have been included in the change order particularly where Contractor knew that it would be required to sign an acknowledgement in the nature of an accord and satisfaction on each change order accepting the amount thereof in full satisfaction of the work. ██ Furthermore, during the course of trial and in the briefs and record on appeal, Contractor has not segregated and has made no apparent effort to segregate delays and resulting damage, if any, which were attributable to Architects' alleged negligence in preparing the initial plans and specifications and the Architects' alleged negligence in supervising the work. There is a substantial legal difference. As the United States Court of Appeal, 9th Circuit, pointed out in *Lundgren* v. *Freeman* (9th Cir. 1962) 307 F.2d 104, 116, an architect occupies three different roles or legal positions in relation to the ordinary construction contract:

1. He is an independent contractor in the preparation of the initial plans and specifications. It is now well settled that in such capacity the architect may be sued for negligence in the preparations of plans and specifications either by his client or by third persons;

2. He is an agent of the owner in supervising the construction work as it progresses; and

---

for concrete. Another cause of delay was a "rock pocket" found after the forms were removed in concrete arch 56 and which required "repair." The "repair" consisted of demolition of the arch and construction of a new one. This delay was caused solely by Contractor. In various C.O.s, Contractor was granted several extensions due to delays caused by rain and inclement weather and several extensions due to delays caused by strikes. During all of these periods at least a portion of its overhead expenses must have continued. Contractor made no effort to explain or segregate.

3. He is a quasi-judicial officer with certain immunity when he acts as arbiter in resolving disputes between the owner and the contractor.

In *Lundgren, supra,* the court held that the architect could not be sued for simple negligence in supervising the construction work as it progresses, where the contractor sues and collects from the owner and the architect has judicial immunity for his decisions as arbiter because in that position he acts as a quasi-judicial officer.[18]

In *Lundgren* the court concluded that architects could be held liable if they acted fraudulently or with wilful or malicious intent to injure the contractor, none of which elements are alleged or even attempted to be alleged in the case at bar except by the attempted cause of action for intentional inference with contractual relationship (which we have already discussed).

---

[18]In *Lundgren v. Freeman, supra,* 307 F.2d 104, the court said at pages 116-118:

"As agents, architects are not here liable for decisions made by them, acting within their powers as agents, because Lundgren has elected his remedy. It is generally held that a plaintiff who has had the existence or extent of a wrong litigated in an action against the principal may not thereafter have the same matters litigated as to the agent. (See 31 A.L.R. 194-97; 30A American Jurisprudence, Judgments, §§ 429-30). The better rule seems to be that a plaintiff who has recovered against a principal may sue the agent for the balance of an unsatisfied judgment against the principal. [Citations.] This, however, is not such an action. A widely held view is that by suing the principal, the plaintiff has elected to rely on the principal's financial resources, evidently on the reasoning that the agent should not be sued twice,—once by the principal for the amount of the judgment the principal has paid, and again by the plaintiff. [Citations.] The Oregon courts do not seem to have passed on the subject. We think that, in this particular case, Lundgren made an election on the contracts. They expressly provide that architects' decisions are subject to arbitration, and the arbitration is between Lundgren and school district. (Footnote 2, supra.) It is clearly contemplated that architects may make erroneous decisions, and a means of rectifying them is provided. We see no reason for adding another remedy against architects, at least where the judgment against school district is not uncollectible. This rule, we think applies whether architects' actions were intentional, negligent or merely erroneous.

"What we have said applies equally to acts done by architects as quasi-arbitrators. There is a further reason why they should be protected when so acting. If their decisions can thereafter be questioned in suits brought against them by either party, there is a real possibility that their decisions will be governed more by the fear of such suits than by their own unfettered judgment as to the merits of the matter they must decide. It is for this reason that architects, acting as quasi-arbitrators, have been held immune from suit. [Citations.] An architect acts as a 'quasi-arbiter' within this rule when, using the contract as a guideline, he resolves disputes between owner and contractor. [Citations.] Thus in some instances the architect, as quasi-arbiter, may have to re-examine positions taken by himself as the owner's agent. Oregon immunizes state officials acting in a judicial capacity from suit, if they are acting within their jurisdiction, in order to prevent fear of suit from influencing their decisions. [Citations.] We presume that this policy extends to private persons acting in a quasi-judicial capacity within jurisdiction established by private agreement."

In our view the Architects can be held liable for their negligent acts in the capacity of an independent contractor. ■ The general rule in California is that a professional person may be held liable to third persons who suffer damage proximately caused by the negligence of the professional person as an independent contractor in the performance of his professional duties even though there is no privity of contract between the third person and the professional person and even though the client does not complain about the quality of the professional service. (*Lucas* v. *Hamm* (1961) 56 Cal.2d 583 [15 Cal.Rptr. 821, 364 P.2d 685] (lawyers); *Biakanja* v. *Irving* (1958) 49 Cal.2d 647 [320 P.2d 16, 65 A.L.R.2d 1358] (notary public); *Gagne* v. *Bertran* (1954) 43 Cal.2d 481, 487-488 [275 P.2d 15] (soil engineer); *Kent* v. *Bartlett* (1975) 49 Cal.App.3d 724 [122 Cal.Rptr. 615] (surveyors); 15 Hastings L. J. 579 (1964) (architects); 47 Cal.L.Rev. 645, 674 (1959) (architects).) However, see *Goodman* v. *Kennedy* (1976) 18 Cal.3d 335 [134 Cal.Rptr. 375, 556 P.2d 737] (lawyers).[19] The reason for the rule is that the action is ex delicto, not ex contractu. Originally professional persons were exempt from liability to third persons because it was believed that they owed their duty to their clients not to third persons. In *Biakanja,* v. *Irving, supra,* 49 Cal.2d 647, the court, rejecting the privity of contract requirement declared that whether or not liability to third persons existed ". . . involves the balancing of various factors, among which are the extent to which the transaction was intended to affect the plaintiff, the foreseeability of harm to him, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, and the policy of preventing future harm." (49 Cal.2d at p. 650.) Foreseeability and proximate cause now supplant the former requirement of privity of contract.

Here the parties contemplated by their contract from the outset that the Architects' plans and specifications (prepared in the capacity of an independent contractor) might well contain errors and omissions. They undertook to protect from consequent damage by requiring the bidders to carefully inspect the plans and specifications and site *before* bidding,

[19]In view of the recent decision of the Supreme Court in *Goodman* v. *Kennedy, supra,* we have some mental reservation that an architect can be held liable to contractor for simple negligence in view of the fact that Owner did not intend to confer a benefit on Contractor and dealt with Contractor at arm's length. However, in view of the ultimate overall conclusion which we reach, we proceed on the assumption that in a proper case an architect could be held liable to a contractor for simple negligence in preparing plans and specifications.

call attention to any needed corrections and warrant that they had done so in submitting their bids. A further safety factor was a contractual arrangement for change orders as the work progressed in order to take care of any latent errors, omissions or changes required, but which were discovered only as the work progressed. ▪ We do not say that *under these* circumstances Architects cannot be held liable for damages proximately caused by negligence in preparing plans and specifications. What we do say is that Contractor in attempting to prove its case was required to distinguish between those alleged acts of negligence by Architects in their capacity as independent contractors and their negligent acts as agents of the Owner in supervising the work and their acts as quasi-judicial arbiters in resolving disputes between the Owner and Contractor. Here, Contractor made no such effort.

Contractor complains that the trial court did not allow in evidence certain documents which it claims proved that Architects were negligent in delaying for an unreasonable time the processing of C.O.s or shop drawings required by C.O.s. Although there was conflicting expert evidence on this point, Contractor claims here that the normal time should have been 5-10 days whereas Architects actually took several times the usual period. There are two answers. First, the delays complained of were in the course of Architects' supervisorial functions as agent of the Owner and were therefore not actionable under principles enunciated in *Lundgren, supra,* which we have already discussed. ▪ Second, and more importantly, where a C.O. based upon Contractor's C.E. was unduly or unreasonably delayed, the Contractor's remedy was to refuse to accept the C.O., unless there was an additional cost allowance for the additional time delay. We think that Contractor had a duty to then advise the Owner and Architects that the additional delay would result in additional cost. The Contractor had no right to accept the C.O., sign the accord and satisfaction clause, and then claim additional cost, which is what it is now doing. When Contractor accepted the delayed C.O. and signed the accord and satisfaction clause (see fn. 3, *ante*) the Contractor in contemplation of law waived any claim of damage for the delay in processing the C.O. The law is clear that Contractor could legally waive its claim for damage resulting from delay. (*Hansen* v. *Covell* (1933) 218 Cal. 622 [24 P.2d 772, 89 A.L.R. 670]; *Frank T. Hickey, Inc.* v. *L.A.J.C. Council* (1954) 128 Cal.App.2d 676 [276 P.2d 52].) We conclude that it has done so.

Contractor argues that the trial court misconstrued the law regarding the difference between a cause of action for simple negligence and a

cause of action for negligent misrepresentation and that as a consequence it applied the wrong rule of the measure of damages and that if it had applied the correct rule, it would have received plaintiff's exhibit 3 in evidence. In reliance on *Gagne v. Bertran, supra,* 43 Cal.2d 481, Contractor contends that in a case of negligent misrepresentation (as distinguished from a case of simple negligence) it was entitled to the difference between the value of the "property" (the construction contract) as it was and as it would have been if it had been as represented, i.e., that Contractor is entitled to the entire difference between the bid price and the total cost of the completed project. *Gagne* does not support Contractor's position. In *Gagne,* the court said: "As indicated above, however, defendant's undertaking was limited to exercising due care to determine and report the extent of the fill, and the damages, *whether for deceit or negligence,* must be measured by the actual losses suffered because of the misrepresentation." (Italics ours.) (43 Cal.2d at p. 490.) As authority, the court cited, inter alia, Civil Code section 3333 which reads: "For the breach of an obligation not arising from contract, the measure of damages, except where otherwise expressly provided by this Code, is the amount which will compensate for all the detriment proximately caused thereby, whether it could have been anticipated or not."

It is clear that when the court used the word "because" in the foregoing quotation from *Gagne* it was using it as the equivalent of "proximately caused" as used in Civil Code section 3333. It is manifest therefore, that whether Contractor's cause of action was an action for "negligence" or "negligent misrepresentation" or both, Contractor was required to prove "the detriment proximately caused" by Architects' alleged breach of architectural duty in failing to prepare plans and specifications which did not contain errors or omissions.

To paraphrase *Gagne* and apply it to the case at bar: Architects' undertaking was limited to exercising due care in the preparation of the plans and specifications and the damages *whether for deceit or negligence* must be measured by the actual losses which were proximately caused by the alleged misrepresentation. None of the excluded evidence provided that causal connection between breach of duty and resulting damages.

Although we have no desire to become enmeshed in an esoteric discussion, we note parenthetically that there would appear to be an additional reason why *Gagne* does not assist Contractor's position. In

*Gagne* the soil engineer made a *positive* assertion. In the case at bar, Contractor relies on an *implied* representation. No case has been cited and we find none in which any court held that the doctrine of negligent misrepresentation applies to *implied* representations. In all cases a "positive assertion" was involved. (See *Gagne* v. *Bertran, supra,* 43 Cal.2d 481; *Hale* v. *George A. Hormel & Co.* (1975) 48 Cal.App.3d 73, 82-87 [121 Cal.Rptr. 144]; *United States* v. *Rogers & Rogers* (S.D. Cal. 1958) 161 F.Supp. 132; Civ. Code, § 1572, subd. 2; 4 Witkin, Summary of Cal. Law (8th ed. 1974) Torts, §§ 480-482, pp. 2739-2744.) An implied representation would not appear to be a "positive assertion" which Civil Code section 1572, subdivision 2, requires as the basis for a negligent misrepresentation. However, we regard the alleged difference between negligence and negligent misrepresentation as academic in the case at bar since there was a failure of proof of causal connection under both theories.

Contractor's entire attitude in the court below and in this court is that it is entitled to be compensated for all losses sustained over its original estimate. (See discussion under measure of damages.) Stated in its simplest form, Contractor's position is that since the plans and specifications contained errors and omissions and the Architects were negligent in supervising the work and there were delays in completing the project and Contractor sustained a loss, Contractor should be made whole by Architects. Contractor apparently does not even make an effort to segregate and give the Architects credit for moneys and time credits (90 days) recouped by Contractor in its settlement with Owner.

Contractor asserted in the court below and here that it was not required to segregate total cost overruns from moneys received from Owner under C.O.s (or by the settlement with Owner) because of the "collateral source" rule. The fallacy of course, is that Owner was not a *collateral* source—it was the primary debtor insofar as Contractor was concerned. After all, it was Owner's building. Owner was not in the position of an insurance company with secondary liability. Contractor apparently seeks a double recovery.

When we try to ascertain precisely what Architects did or failed to do which proximately caused damage to Contractor, Contractor's opening brief on appeal merely refers us to its counsel's closing argument to the jury in the court below which is appended as an exhibit to its opening brief on appeal. Although such argument does not cite any portions of

either the clerk's or reporter's record and therefore does not comply with the rules on appeal (Cal. Rules of Court, rule 15(a)); 6 Witkin, Cal. Procedure (2d ed. 1971) Appeal § 421, p. 4389), we have nevertheless read the 63-page argument in an effort to ascertain precisely what Contractor claims. Apparently it complains of seven specific items of work:

1. The main truss design for the roof of the theatre was defectively designed and had to be firred out two inches, which allegedly delayed the project 75 days;

2. The foundation footings, which were to be "one foot six inches below finished grade or actual grade whichever is lower or as otherwise noted," were inadequately described because there was no specification of precise elevation (presumably above sea level), which allegedly resulted in three weeks delay;

3. The cooling tower footings (for the air conditioning system) were defectively designed and the requisite corrections allegedly delayed the fireproofing of the structural steel;

4. Material originally specified for the ice rink insulation was not available, which required use of a substitute material which was more difficult to use and resulted in alleged delay of two weeks; (in this connection Architects point out that Contractor finished the work in the ice rink one month ahead of Contractor's schedule);

5. The plans did not adequately describe the location of the speaker grills (for the public address system) and the location of the diffuser lights, which required someone to make a decision on their location with reference to each other;

6. During the course of construction the Architects required the Contractor to produce an "absolutely smooth surface" on the concrete work whereas such requirement appeared only in the "repair" section of the original specifications, which resulted in increased labor costs;

7. The specifications were defective in relation to the concrete work in the arena because they did not specify the permissible deviation or variance on the face of the concrete risers to which the seats were to be bolted but merely specified that the seats to be installed on the risers

would be supplied by American Seating Co. American Seating Co. allegedly required a deviation or variance on the face of the concrete risers of not more than one-fourth inch. Contractor apparently assumed that a greater deviation or variance would be permitted. After the concrete *was poured,* Contractor allegedly discovered the American Seating Co. requirement and Contractor was required to begin "bush-hammering" the risers down to meet the required tolerance. The Contractor apparently worked too slowly, was removed from that portion of the project, and was replaced by a substitute contractor (Merritt Strunk). Contractor complains that Architects imposed less stringent tolerance requirements on the substitute contractor, who was permitted to relax the tolerance requirements. Architects reply that any relaxation of tolerance was because of necessity not because of any desire to favor the substitute contractor. There was a conflict in the evidence as to whether the excessive deviation or variance on the face of the concrete risers was due to the alleged fact that Contractor's forms slipped during the pouring of the concrete, rather than any uncertainty over the specification requirements.

We have searched this record (contrary to our obligation as an appellate court) and we have been unable to find any excluded evidence which would have shed any light or provided the jury with any additional information regarding any one of these seven specifications of Architects' neglect, particularly with reference to whether or not they resulted in any damage to Contractor and, if so, how much. We have found no excluded evidence which should have been admitted. Each of the seven specifications was fully litigated. The jury decided against the Contractor on each of the seven specifications. ▉ Many of the seven specifications involved actions by the Architects as agents of the Owner in the supervision of the work or as quasi-judicial officers acting as arbiters between Owner and Contractor and would not have been actionable in any event under principles enunciated in *Lundgren, supra,* in the absence of pleading and proof of wilful misconduct or malice. Contractor's basic problem here and in the court below was not over any esoteric difference, if any, between a cause of action for Architects' simple negligence and a cause of action for Architects' negligent misrepresentations. Contractor's basic problem stems from a failure of evidence to establish causation—the proximate cause of its loss, if any.

We are not persuaded that any excluded evidence would have supplied the missing element of proof or that it would have produced a different result.

■ As noted Contractor concedes on this appeal that plaintiff's exhibit 3 for identification was the *single* piece of evidence which established Contractor's damage. Since, as already noted, we conclude that exhibit 3 was properly excluded from evidence, it would appear from Contractor's own admission that there was no competent admissible evidence which established that Contractor sustained any damage proximately caused by Architects' negligence in preparing the plans and specifications. In our opinion, no miscarriage of justice occurred. Under these circumstances we may not reverse because of the exclusion of evidence. (Evid. Code, § 354.)[20]

### RULINGS REGARDING THE MEASURE OF DAMAGES

■ We next consider Contractor's contention that the trial court committed error in its rulings regarding the correct measure of damages to be applied in the case. Contractor contends that because Architects would not allow it all of the time extensions it requested on C.O.s and because of Architects' delays in supervision, it was required to accelerate its work under the contract, thereby suffered damage, and consequently lost profits on the project. Contractor claims that it was error for the trial court to refuse to allow it to proceed under the "total cost" principle in proving its damage. This contention is dependent upon the admissibility of plaintiff's exhibit 3 which we have already discussed.

Contractor relies on *H. John Homan Co.* v. *United States* (1969) 418 F.2d 522 [189 Ct.Cl. 500] and *J.D. Hedin Construction Company* v. *United States* (5th Cir. 1965) 347 F.2d 235 [171 Ct.Cl. 70]. Architects and the trial court relied on the subsequent case of *Boyajian* v. *United States* (1970) 423 F.2d 1231 [191 Ct.Cl. 233] which explains and distinguishes *Hedin*.

Under the "total cost" method of proof Contractor claims that it was entitled to collect the $732,521 difference between its initial bid estimate and the total cost of the project as shown by Appendix A attached

---

[20]Evidence Code section 354 reads:

"A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous exclusion of evidence unless the court which passes upon the effect of the error or errors is of the opinion that the error or errors complained of resulted in a miscarriage of justice and it appears of record that:

"(a) The substance, purpose, and relevance of the excluded evidence was made known to the court by the questions asked, an offer or proof, or by any other means;

"(b) The rulings of the court made compliance with subdivision (a) futile; or

"(c) The evidence was sought by questions asked during cross-examination or recross-examination."

hereto.[21] The trial court correctly applied principles enunciated in *Boyajian* v. *United States, supra.*[22] We think the following statement by the United States Court of Claims in *Boyajian, supra,* is particularly

[21]Our calculations indicate that this claim makes no allowance for the change of work authorized by the C.O.s, the moneys paid and the credits allowed pursuant to such 25 C.O.s, or the moneys and time credits which Contractor recouped in its settlement with Owner. Such settlement allowed Contractor 90 days of credit in addition to amounts previously allowed on specific C.O.s. Architects point out in their reply brief herein that the contract date of completion was June 9, 1966, and the Owner did not occupy the convention center complex until October 12, 1966, approximately 123 days late. One year later the project had not yet been completed. As late as December 31, 1972, Contractor's own records (plaintiff's exhibit 3 for identification) indicated that an additional expenditure of $72,500 was required to complete the project. Architects claim that Contractor's losses, if any, were attributable to Contractor's incompetence.

[22]In *Boyajian,* the court said:

"Recovery of damages for a breach of contract is not allowed unless acceptable evidence demonstrates that the damages claimed resulted from and were caused by the breach. 'The costs must be tied in to fault on defendant's part.' [Citations.]

" . . . . . . . . . . . . . . . .

"However, contrary to these basic causal-connection damage principles, no attempt is here made to relate any specific amount of increased costs to any particular alleged breach. Nor is any satisfactory explanation given as to why such an attempt was not made or why it would not have produced reasonably accurate results. Instead, the damage proof consists only of an accountant's schedule (and the accountant's testimony in support thereof), setting forth computations, based on plaintiff's books and records, of plaintiff's total expenditures in performing the contract, and subtracting therefrom the total contract receipts, thus arriving at a total 'loss' figure, for which plaintiff demands recoupment. . . .

" . . . . . . . . . . . . . . . .

"On this record, it is not possible to conclude that plaintiff's total contract loss, *i.e.,* the difference between plaintiff's contract expenditures and its contract receipts, is reasonably to be equated with the increased costs directly resulting from defendant's alleged breaches.

" . . . . . . . . . . . . . . . .

"In situations similar to the instant one, the court has consistently rejected damage claims based on the theory that all unreimbursed contract expenditures of every nature made throughout the life of the contract should be reimbursed. . . . [Citing cases.]

" . . . . . . . . . . . . . . . .

"None of such cases [relied on by Contractor] were comparable to the instant one, in which several breaches are alleged but consolidated for damage purposes into a claimed unadjusted 'total cost' recovery. The above review indicates that the court has never allowed such a recovery in such a case. On the other hand, it has consistently insisted on a showing that 'the excess costs claimed must be tied in to defendant's breaches' (*J. D. Hedin Construction Co., supra,* 347 F.2d at 259, 171 Ct. Cl. at 108), especially where as here, there is an insufficient showing that such a direct damage calculation could not as a practical matter be made.

"Nor does the mere fact that plaintiff's books and records do not, in segregated form, show the amounts of the increased costs attributable to the breaches give it automatic license to use the 'total cost' method. Contractors rarely keep their books in such fashion. Such failure, however, normally does not prevent the submission of reasonably satisfactory proof of increased costs incurred during certain contract periods or flowing from certain events based, for instance, on acceptable cost allocation principles or on expert testimony. . . ." (423 F.2d at pp. 1235-1236, 1238-1239, 1242.)

relevant to the basic problems involved in the case at bar: "Nor does the mere fact that plaintiff's books and records do not, in segregated form, show the amounts of the increased costs attributable to the breaches give it automatic license to use the 'total cost' method. Contractors rarely keep their books in such fashion. Such failure, however, normally does not prevent the submission of reasonably satisfactory proof of increased costs incurred during certain contract periods or flowing from certain events based, for instance, on acceptable cost allocation principles or on expert testimony. . . ." (423 F.2d at p. 1242.)

Contractor's position here and in the court below seems to be simply that although admittedly its computer operated accounting system did not distinguish in any manner between ordinary costs and alleged increased costs proximately caused by Architects' alleged negligence, nevertheless since such computer accounting system was kept in accordance with standard business practices, Contractor was entitled to collect its entire loss as shown by such computer accounting system (plaintiff's exhibit 3) without being required to prove the normal elements of damage proximately caused by negligence. In other words, Contractor's business accounting methods should be allowed to control principles of law rather than principles of law controlling Contractor's business accounting methods. We are not prepared to embrace that concept, particularly when it is obvious that Contractor could have maintained a proper accounting system to establish its alleged damage proximately caused by Architects' alleged negligence, if it had desired to do so. Apparently it simply did not desire to do so.

It seems manifest that the computer printout was based upon records of original entry such as invoices for materials, cancelled checks for labor and material, time sheets and other normal and customary business records universally used in the business world. We cannot believe that Contractor fed into the computer raw data picked out of thin air. In fact, Bennett admitted that records of original entry existed during construction, but they were not produced at trial and no calculations therefrom were prepared. The failure is not explained. If the computer printout was not organized in a manner to indicate the specific cause of particular cost overruns, a qualified accountant should have been able to make the calculations from the original records which were the source for the data fed into the computer. But nobody took the time and effort to make any such calculations. No explanation is given for the failure.

If we were to accept Contractor's contention as the law of this state, the result would, for all practical purposes, nullify all laws regarding competitive bidding on public contracts. Under such a concept, contractors could submit any bid necessary to obtain the job knowing that the public agency (or its architects) would be required to pay whatever costs contractor incurred on the project if contractor could discover some error or omission *however irrelevant* in the plans and specifications. ■ In the final analysis what Contractor actually complains of is that the amount of money which Owner paid Contractor under the 25 C.O.s and the time allowed for the changes or additional work was not sufficient to reimburse Contractor for its total cost and total delay. Contractor argues that somehow the total result exceeded the sum of the 25 parts. Assuming without deciding that such a result is within the realm of logical possibility, we think that the responsibility for the result lies with Contractor, not with Architects. It was within Contractor's legal power to compute estimated change order costs in a manner which would compensate Contractor for its total loss. It failed to do so. Architects were not legally responsible for that failure. So far as we can tell from this record, Contractor was paid in almost every instance what Contractor requested on the 25 C.O.s issued. Contractor simply did not request enough on those C.O.s which were authorized. A factor of 10 percent or 15 percent for administration and overhead was obviously too low if Contractor's present claims are accurate.

We find no error in the trial court's refusal to allow Contractor to prove damage under the total cost concept.

## ERRORS REGARDING JURY INSTRUCTIONS

Lastly, we consider Contractor's contention that the court committed reversible error in refusing to give its requested unnumbered instruction regarding negligent misrepresentation.[23]

---

[23]The unnumbered "instruction" (disregarding the citation of authorities) reads as follows:

"One of the issues you must decide is whether defendant architects are liable to the plaintiff general contractor for harm suffered by the general contractor due to the architects' negligent conduct in supplying information.

"The rule followed in this state is that one who in the course of his business or profession supplies information for the guidance of others in their business transactions is subject to liability for harm caused to them by their reliance upon the information if:

"(1) the supplier of information fails to exercise that care and competence in obtaining and communicating the information which its recipient is justified in expecting, and

"(2) the harm is suffered

 "(i) by the person or one of the class of persons for whose guidance the

■ At the outset, we are confronted with the question of whether or not the instruction was "requested" and the question of whether or not the court "refused" to give the instruction. The clerk's transcript contains a document filed April 2, 1973, by Contractor entitled "Statement of Fact; Proposed Voir Dire; Form of Verdict and Partial Jury Instructions of Plaintiff" within which is bound the unnumbered "instruction" quoted

---

information was supplied, and

"(ii) because of the harmed person's justifiable reliance upon the information in a transaction in which it was intended to influence his conduct.

"In applying this rule to the case at bar, you must consider the following items:

"(1) whether defendant architects, in the course of their business or profession, supply information for the guidance of others in their business transactions

"(2) whether plaintiff general contractor relied upon such information in conducting its business transactions

"(3) whether plaintiff general contractor was the person or one of the class of persons for whose guidance the architects supplied information

"(4) whether plaintiff general contractor suffered harm in a transaction in which the architect-supplied information was intended to influence the general contractor's conduct.

"If you do not find affirmatively on these four questions, you must find for the defendant architects on this issue.

"If you do find affirmatively on these four items, you must consider two additional questions:

"(1) Did the architects fail to exercise that care and competence in supplying information which the general contractor was justified in expecting?

"To help you answer this question, I point out to you that the degree of care and competence which the general contractor was justified in expecting is sometimes stated to be the standard of care of competence prevailing in the architectural profession.

"You have heard evidence on the matter of professional architectural standards and on the care and competence exercised by the architects in this case.

"While evidence of standards in the same profession is provided for your consideration, it is not conclusive on what constitutes care and competence. Conformity to general standards will not excuse conduct which is inconsistent with due care. A person cannot justify his failure to use due care by showing that others in the same profession practice a similar want of care.

"(2) Was the general contractor justified in relying on the architect-supplied information in conducting its business transactions?

"On this question, much evidence has been presented. The court has only two points to add. First, the general contractor's reliance on the architect-supplied information would not be unjustified merely because a statement included in the information proclaimed that the issuer of said information would not be responsible for its accuracy or completeness. Second, a defendant who misrepresents the facts and induces the plaintiff to rely on his statements cannot assert that the plaintiff's reliance was unjustified unless plaintiff's conduct, in the light of his intelligence and information, is preposterous or irrational. You must consider all the circumstances of the transactions involved in this case to decide whether the general contractor's reliance on architect-supplied information was justified.

"If your answers to the last two questions are affirmative, you must find for plaintiff general contractor, and must award to him damages for the harm you find he sustained due to the architect's negligent conduct in supplying information.

"If both answers are not affirmative, you must find for defendant architects on this issue."

in the footnote. The trial court's minute order of April 6, 1973 (quoted fn. 10, *ante*), indicates that the court would grant Contractor's request if supported by the evidence to instruct the jury on the subject of "negligent misrepresentation." However, the reporter's transcript on appeal does not indicate the jury instructions as actually given to the jury by the trial court on August 16, 1973. The reporter's transcript does contain a partial record of the court's discussion with counsel in chambers regarding what instructions it would and would not give. In the portion of the discussions which were on the record (portions were "off the record") the instructions were discussed by number not by subject matter except incidentally. It does not affirmatively appear from such reporter's transcript that the instruction here in question was ever discussed. The instruction in question is not contained within that portion of the clerk's transcript which contains the instructions which were "given" or the portion of the clerk's transcript which contains the instructions which were "refused."

We are left to speculate as to what if anything actually happened to the instruction. We know not whether the instruction was withdrawn, abandoned, or lost in the shuffle.

Bearing in mind that the instruction was "requested" on April 2, 1973, in a document filed in the clerk's file and the court did not reach a point in the trial of discussing with counsel the instructions to be given and to be refused until August 13, 1973, it is most probable that the instruction was lost in the shuffle of all of the papers involved in such an extended trial, but that is sheer speculation on our part. Under the rules governing this appeal, we must presume that Contractor withdrew its request because it is incumbent upon Contractor, as appellant, to make certain that the trial court has ruled and that the record on appeal discloses that ruling before the alleged ruling may be assigned as error. (*Lynch* v. *Birdwell* (1955) 44 Cal.2d 839 [285 P.2d 919]; *Vaughn* v. *Jonas* (1948) 31 Cal.2d 586, 596 [191 P.2d 432]; *Morehouse* v. *Taubman Co.* (1970) 5 Cal.App.3d 548, 559 [85 Cal.Rptr. 308].) In *Faulk* v. *Soberanes* (1961) 56 Cal.2d 466, 471 [14 Cal.Rptr. 545, 363 P.2d 593], the court said: "*Plaintiff, as appellant, has the burden to present a record sufficiently complete to establish that the claimed errors were not invited by her, and in the absence of such a showing she may not properly complain.*" (Italics ours.)

■ However, notwithstanding the foregoing rules we have examined the instruction in question and have concluded that it is not a

correct statement of the law in any event and if it was requested and if it was refused, it was properly refused. The entire instruction relates to "the Architects' negligent conduct in supplying information," making no distinction between the alleged negligent conduct of the Architects in supplying information in their capacity as independent contractors and their alleged negligent conduct in supplying information in their capacity as agents of the Owner in supervising the work as it progresses and their alleged negligent conduct in delaying rulings in their capacity as arbiters and quasi-judicial officers, all as enunciated by *Lundgren, supra.* Also, the instruction required the jury to award Contractor all damage sustained "due to" the Architects' negligence whether or not proximately caused by such alleged negligence.

Furthermore, the instruction directed the jury to disregard the testimony of experts regarding the standard of care to which Architects were required by law to adhere without proper guidelines regarding the circumstances under which the jury would be permitted to disregard such expert testimony. Ordinarily, where a professional person is accused of negligence in failing to adhere to accepted standards within his profession the accepted standards must be established only by qualified expert testimony (*Lawless* v. *Calaway* (1944) 24 Cal.2d 81 [147 P.2d 604]; *Trindle* v. *Wheeler* (1943) 23 Cal.2d 330 [143 P.2d 932]; *Stephenson* v. *Kaiser Foundation Hospitals* (1962) 203 Cal.App.2d 631 [21 Cal.Rptr. 646]) unless the standard is a matter of common knowledge (*Ales* v. *Ryan* (1936) 8 Cal.2d 82 [64 P.2d 409]; *McBride* v. *Saylin* (1936) 6 Cal.2d 134 [56 P.2d 941]). However, when the matter in issue is within the knowledge of experts only and not within common knowledge, expert evidence is conclusive and cannot be disregarded. (*Engelking* v. *Carlson* (1939) 13 Cal.2d 216 [88 P.2d 695]; *Paxton* v. *County of Alameda* (1953) 119 Cal.App.2d 393 [259 P.2d 934]; *Danielson* v. *Roche* (1952) 109 Cal.App.2d 832 [241 P.2d 1028].) In the proposed instruction in the case at bar, the jury would in effect have been told that the testimony of experts regarding the proper professional standards could be disregarded if the standards did not conform to the jury's concept and determination of what was "due care."

We conclude that if the instruction in question was requested and, if it was refused by the trial court, it was properly refused because it was an incorrect statement of the law at least in the several respects noted.

Architects admit in their brief on appeal that their cross-appeals on the judgment of nonsuit in favor of Electrical Engineers and the judgment

on jury verdict in favor of Structural Engineers are "protective appeals" only and they agreed at oral argument that if we affirm the judgment against Contractor and in favor of Architects on the principal appeal then such cross-appeals are moot. Since we conclude that the judgment against Contractor and in favor of Architects should be affirmed we agree that the cross-appeal is moot and the two judgments on the cross-complaint will be affirmed.

 Finally, we consider Architects' contention that the trial court committed error in its various rulings allowing and disallowing certain costs as claimed by Architects.

Prior to trial, Architects made an offer under Code of Civil Procedure section 998[24] to settle with Contractor for $55,000, which was never accepted by Contractor. In their memorandum of costs after judgment in their favor Architects sought $11,654.49 for moneys which they actually paid for the services of four experts as follows:

---

[24]Code of Civil Procedure section 998 reads:

"(a) The costs allowed under Sections 1031 and 1032 shall be withheld or augmented as provided in this section.

"(b) Not less than 10 days prior to commencement of the trial as defined in subdivision 1 of Section 581, any party may serve an offer in writing upon any other party to the action to allow judgment to be taken in accordance with the terms and conditions stated at that time. If such offer is accepted, the offer with proof of acceptance shall be filed and the clerk or the judge shall enter judgment accordingly. If such offer is not accepted prior to trial or within 30 days after it is made, whichever occurs first, it shall be deemed withdrawn, and cannot be given in evidence upon the trial.

"(c) If an offer made by a defendant is not accepted and the plaintiff fails to obtain a more favorable judgment, the plaintiff shall not recover his costs and shall pay the defendant's costs from the time of the offer. In addition, in any action or proceeding other than an eminent domain action, the court, in its discretion, may require the plaintiff to pay the defendant's costs from the date of filing of the complaint and a reasonable sum to cover costs of the services of expert witnesses, who are not regular employees of any party, actually incurred and reasonably necessary in the preparation of the case for trial by the defendant.

"(d) If an offer made by a plaintiff is not accepted and the defendant fails to obtain a more favorable judgment, the court in its discretion may require the defendant to pay a reasonable sum to cover costs of the services of expert witnesses, who are not regular employees of any party, actually incurred and reasonably necessary in the preparation of the case for trial by the plaintiff, in addition to plaintiff's costs.

"(e) Police officers shall be deemed to be expert witnesses for the purposes of this section; plaintiff includes a cross-complainant and defendant includes a cross-defendant. Any judgment entered pursuant to this section shall be deemed to be a compromise settlement.

"(f) The provisions of this chapter shall not apply to an offer which is made by a plaintiff in an eminent domain action."

| | |
|---|---:|
| Ralph Zimmerman | $ 428.20 |
| Charles A. Bode | 7,672.50 |
| Ralph Nicholson | 3,441.79 |
| Calvin G. Ellis | 112.00 |

The court on motion to tax costs allowed only $2,000 for Charles A. Bode and refused to allow any sum for Zimmerman, Nicholson or Ellis.

Architects allege that the trial court refused to allow the claimed costs because the trial court was trying to punish Architects for their offer of $55,000 being inadequate. Architects claim that the amount of the offer to settle was reasonable under the circumstances, particularly in view of the fact that it represented 23.2 percent of the amount ($236,632) which Contractor's counsel requested the jury to award in closing arguments.

The trial court has discretion under Code of Civil Procedure section 998 to allow a prevailing party (as defined in the section) a reasonable sum to cover the costs of the services of expert witnesses. (*Pomeroy* v. *Zion* (1971) 19 Cal.App.3d 473 [96 Cal.Rptr. 822].) The trial court was in a far better position, having heard the entire case and observed the demeanor of witnesses, to exercise this discretion and determine what was a reasonable amount and what was reasonably necessary. It appears that at least one of the witnesses may have been a percipient witness rather than an expert. Architects have not established here that the court abused its discretion.

The judgment against appellants Huber, Hunt & Nichols, Inc., and in favor of respondents Richard R. Moore et al. is affirmed; the two judgments against cross-appellants Richard R. Moore et al., and in favor of cross-respondents McDougald and Leino et al., are each affirmed. The order taxing costs and order modifying order taxing costs are affirmed.

Brown (G. A.), P. J., and Gargano, J., concurred.

APPENDIX "A"

1. Forming Criteria.

| Code | Item | | | Claim |
|---|---|---|---|---|
| 311 | Walls | OR | $17,517.00 | $99,000.00 |
| 321 | Joist Pan | | | |
| | Slabs | OR | 21,411.00 | 21,411.00 |
| 322 | Beams | OR | 12,494.00 | 12,494.00 |
| 340 | Bleachers | OR | 73,644.00 | 65,644.00 |
| 435 | Final Finish | OR | 37,906.00 | 37,906.00 |
| | Fringes | | | 20,644.00 |
| | Sub-Total: | | | $ 168,099.00 |

2. Delays.

| Code | Item | | | Claim |
|---|---|---|---|---|
| 1502 | Organization | OR | $35,923.00 | $35,923.00 |
| 1503 | Engineering | OR | 6,286.00 | 1,286.00 |
| 1505 | Office and | | | |
| | Staff | OR | 2,383.00 | 2,383.00 |
| 1506 | Barricades | | | |
| | and Fences | OR | 2,122.00 | 2,122.00 |
| 1514 | Cleanup | OR | 1,025.00 | 1,025.00 |
| 1532 | Scaffold | | | |
| | (labor) | OR | 11,776.00 | 11,776.00 |
| 1502 | Organization | | | |
| | (M) | OR | 159.00 | 159.00 |
| 1508 | Temporary | | | |
| | Light,Water | | | |
| | and Power | OR | 4,192.00 | 4,192.00 |
| 1522 | Telephone | OR | 318.00 | 318.00 |
| 1524 | Office | | | |
| | Supplies | OR | 1,487.00 | 1,487.00 |
| 1525 | Drinking | | | |
| | Water (M) | OR | 1,293.00 | 1,293.00 |
| 1527 | Scaffold (M) | OR | 12,624.00 | 12,624.00 |
| 1555 | Equip. | | | |
| | Rental | OR | 33,226.00 | 33,226.00 |
| | Labor of $7,592 applicable | | | |
| | to fringes: | | | 2,463.00 |
| | Sub-Total: | | | $ 109,327.00 |

### 3. Slabs.

| | | | |
|---|---|---|---|
| 214 | Slab on Grade | OR $ 1,930.00 | $ 1,930.00 |
| 217 | Supported Slab | OR 2,191.00 | 2,191.00 |
| 305 | Slab on Grade | OR 7,418.00 | 7,418.00 |
| 317 | Supported Slab | OR 12,384.00 | 12,384.00 |
| 403 | Trowell Finish | OR 11,967.00 | 11,967.00 |
| 412 | Broom Finish | OR 1,780.00 | 1,780.00 |
| 443 | Joint Sealer | OR 2,062.00 | 2,062.00 |

Sub-Total: $ 39,732.00

### 4. Acceleration.

| | | | |
|---|---|---|---|
| 710 | (L) Mill-work | OR $ 2,824.00 | $ 2,824.00 |
| 711 | (L) Fit and Hang Doors | OR 17,080.00 | 17,080.00 |
| 701 | (M) All Mat. | OR 5,667.00 | 5,667.00 |

Sub-Total (All Fringes Included): $ 28,337.00

### 5. Profit.

The as Bid: $ 300,000.00

Note 2% of gross amount of
contract 6.4 million equals $128,000
is attributable as Home Office
overhead thus gross profit would be
$172,000.

### 6. Footing Elevations.

| | | | |
|---|---|---|---|
| 103 | Fine Grading | OR $20,407.00 | $ 11,055.00 |
| 104 | Backfill | OR 16,503.00 | 16,503.00 |
| 111 | Machine Exc. | OR 2,623.00 | 2,623.00 |
| 155 | Equip. Rental(M) | OR 33,332.00 | 33,332.00 |
| 208 | Cols. and Piers | OR 1,672.00 | 1,672.00 |
| 248 | Clear Cost Joints | OR 3,454.00 | 3,454.00 |
| 202 | Footings (M) | OR 4,779.00 | 4,779.00 |
| 308 | Columns | OR 6,358.00 | 6,358.00 |
| 311 | Walls | OR 17,517.00 | 8,517.00 |
| 360 | Plywood (M) | OR 2,795.00 | 1,300.00 |

| | | | | |
|---|---|---|---|---|
| 362 | Accessories | OR | 865.00 | 400.00 |
| 1503 | Engineering | OR | 6,286.00 | 5,086.00 |
| 1506 | Barracades and Fence | OR | 2,122.00 | 1,000.00 |
| 1503 | Engineering | OR | 759.00 | 754.00 |
| 1555 | Equipment Rental | OR | 33,226.00 | |

Sub-Total (and Fringes): $ 87,026.00

TOTAL: $ 732,521.00